No.  17-10546

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

## UNITED STATES OF AMERICA
Plaintiff-Appellee,


v.


██████████████████

Defendant-Appellant.

---

On Appeal from the Judgment of the
United States District Court for the District of Arizona
D.Ct. No. 4:16-cr-01937-TUC-JAS

---

## REDACTED PROPOSED BRIEF BY AMICI CURIAE IN
## SUPPORT OF DEFENDANT-APPELLANT

---

ARIZONA CENTER FOR DISABILITY LAW
Rose Daly-Rooney #015690
Christian Carlsen #023608
Maya Abela #027232
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Email: rdalyrooney@azdisabilitylaw.org
        ccarlsen@azdisabilitylaw.org
        mabela@azdisabilitylaw.org
Tel:  (520) 327-9547
Fax:  (520) 884-0992

*Attorneys for Amicus Arizona Center for
Disability Law*

WILLIAM E. MORRIS INSTITUTE
 FOR JUSTICE
 Ellen Sue Katz #012214
 3707 North Seventh Street, Suite 300
 Phoenix, AZ 85014
 Email: eskatz@qwestoffice.net
 Tel: (602) 252-3432
 Fax: (602) 252-8138

*Attorney for Amicus William E. Morris Institute
for Justice*

# CORPORATE DISCLOSURE STATEMENTS

In accordance with Federal Rule of Appellate Procedure 26.1, *amicus* Arizona Center for Disability Law certifies that it is a registered 501(c)(3) nonprofit organization, and discloses that it has no parent corporation and that no publicly held corporation holds ten percent (10%) or more of its stock.

In accordance with Federal Rule of Appellate Procedure 26.1, *amicus* William E. Morris Institute for Justice certifies that it is a registered 501(c)(3) nonprofit organization, and discloses that it has no parent corporation and that no publicly held corporation holds ten percent (10%) or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ........................................................ i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES ...................................................................... iv

INTEREST OF *AMICI CURIAE* ................................................................ 1

STATEMENT OF THE ISSUES .................................................................... 3

INTRODUCTION ................................................................................ 4

ARGUMENT .................................................................................... 5

    I.  Mandatory Detention of Individuals Found Incompetent to Stand Trial in a
Locked Inpatient facility—Without An Individualized Determination of the Most
Integrated Setting Appropriate for Their Needs—Violates Section 504 of the
Rehabilitation Act. ......................................................................... 5

    A.  The History of Discrimination by Institutionalization of Individuals with
Mental Disabilities Provides Context for Understanding the Integration
Mandate .................................................................................... 5

    B.  Section 504 of the Rehabilitation Act Prefers Community-Based   Rather
than Institutional Treatment of Individuals Living with Mental Disabilities ........ 9

    C.  The Supreme Court's Interpretation of the ADA's Integration Mandate in
*Olmstead v. L.C. ex rel. Zimring* Applies Equally to Section 504. ................. 12

    D.  The Legally Correct Default for Individuals Determined IST Who Can Be
Served in Community-Based Services Is A Placement in the Community ................ 15

    E.  Like Other Programs and Services, Competency Restoration Services Must
Provided in an Integrated Setting .................................................. 17

II.    The Attorney General's Statutory Obligation to Hospitalize in a Suitable Facility Can be Harmonized with its Section 504 Obligation to Administer its Restoration to Competency Program in the Most Integrated Setting Appropriate. 24

CONCLUSION ..................................................................................27

CERTIFICATE OF COMPLIANCE PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7)(B) AND CIRCUIT RULE 32-1 ...............29

CERTIFICATE OF SERVICE ..............................................................30

# TABLE OF AUTHORITIES

## CASES

*A.R. v. Dudek*, 12-cv-60460 (S.D. Fla. 2012) ........................................17

*Alexander v. Choate*, 469 U.S. 287 (1985) .............................................11

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ......................6

*Id*. ............................................................................... passim

*Katie A., et. al. v. Douglas, et. al.*, CV-02-05662 (C.D. Cal. 2011) .......................17

*Momeni v. Chertoff*, 521 F.3d 1094 (9th Cir. 2008) ................................24

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) .......................2,12

*Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998) .......................15

*Townsend v.* Quasim, 328 F.3d 511 (9th Cir. 2003) ................................17

*Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 822 F.3d 1037 (9th Cir. 2016) ............................................................................23

*Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, C14-1178-MJP, 2016 WL 4268933 (W.D. Wash. Aug. 15, 2016) ................................23

*U.S. v. Georgia*, 1:17-cv-03999 (N.D. Ga. 2017) ................................17

*U.S. v. Marion County Nursing Home District*, 2:13-cv-00026 (E.D. Mo. 2013) ..17

*U.S. v. New York,* 13-cv-4165 (E.D.N.Y. 2013) ................................17

*U.S. v. Rhode Island,* 1:14-cv-00175 (D.R.I. 2014) ................................17

*United States v. Donofrio*, 896 F.2d 1301 (11th Cir. 1990) ................................26

*United States v. Filippi*, 211 F.3d 649 (1st Cir. 2000) ................................26

*United States v. Gallenardo*, 579 F.3d 1076 (9th Cir. 2009) ................................24

*United States v. Shawar*, 865 F.2d 856 (7th Cir. 1989) ................................26

*United States v. Stanford*, 769 F.Supp.2d 1083 (S.D. Tex. 2011) ................................26

iv

**STATUTES**

18 U.S.C. § 4241 ........................................................................................15

18 U.S.C. § 4241(a) ...................................................................................16

18 U.S.C. § 4241(d) ........................................................................... Passim

29 U.S.C. § 794 ......................................................................................1, 14

29 U.S.C. § 794(a) ......................................................................................9

42 U.S.C. § 10801 ........................................................................................1

42 U.S.C. § 10805(1)(B) ..............................................................................1

42 U.S.C. § 12101 ........................................................................................7

42 U.S.C. § 12102(2)(A) ............................................................................16

42 U.S.C. § 12132 ......................................................................................14

42 U.S.C. § 12133 ......................................................................................14

42 U.S.C. § 12134 ......................................................................................15

42 U.S.C. § 15041 ........................................................................................1

42 U.S.C. § 15043(2)(A)(i) ..........................................................................1

42 U.S.C. § 4241(d) .....................................................................................5

725 Ill. Comp. Stat. Ann. 5/104-17..........................................................19

Ariz. Rev. Stat. Ann. § 13-4512................................................................18

Ark. Code Ann. § 5-2-310 .........................................................................18

Cal. Penal Code § 1370..............................................................................18

Colo. Rev. Stat. Ann. § 16-8.5-111............................................................18

Conn. Gen. Stat. Ann. § 54-56d (i)(3) ......................................................18

D.C. Code Ann. § 24-531.05(a)(1) ............................................................21

Fla. R. Crim. P. 3.212 (2018).................................................................18

Ga. Code Ann. § 17-7-130.....................................................................18

Haw. Rev. Stat. § 704-406 (1) ..............................................................18

Idaho Code Ann. § 18-212.....................................................................19

Ind. Code Ann. § 35-36-3-1 ..................................................................19

Iowa Code Ann. § 812.6 ........................................................................19

Md. Code Ann. Crim. Proc. 3-106.........................................................19

Me. Rev. Stat. tit. 15, § 101-D ..............................................................19

N.D. Cent. Code Ann. § 12.1-04-08 ......................................................20

N.J. Stat. Ann. § 2C:4-6 ........................................................................20

N.Y. Crim. Proc. Law § 730.40 .............................................................20

Nev. Rev. Stat. Ann. § 178.425 .............................................................20

New. Hamp. Rev. Ann. 135-17-a ...........................................................20

Ohio Rev. Code Ann. § 2945.38.............................................................20

Or. Rev. Stat. Ann. § 161.370 (2)(a)......................................................20

Tex. Crim. Proc. Code Ann. § 46B.072...................................................20

Va. Code Ann. § 19.2-169.2 ...................................................................20

W. Va. Code Ann. § 27-6A-2-7 ..............................................................21

W. Va. Code Ann. § 27-6A-7 .................................................................21

Wash. Rev. Code Ann. § 10.77.086........................................................21

Wis. Stat. Ann. § 971.14 ........................................................................21

**RULES**

53 Fed. Reg. 2138 ...........................................................................................10

Fed. R. App. P. 29(a)(4)(E)..............................................................................1

La. Code Crim. P. Ann. Art 648 .....................................................................19

Minn. R. Crim. P. 20-01 .................................................................................19

Miss. R. Crim. P. 12.5....................................................................................19

**REGULATIONS**

28 C.F.R § 39.130(d) ......................................................................................11

28 C.F.R. §  35.130 (d) ...................................................................................2

28 C.F.R. § 35.130(d) .....................................................................................15

28 C.F.R. § 39.102 ..........................................................................................15

28 C.F.R. § 39.103 ..........................................................................................16

28 C.F.R. § 39.130(a).......................................................................................11

28 CFR § 39.130(d) .........................................................................................11

42 C.F.R. § 51.31(f) .........................................................................................1

45 Fed. Reg. 37,622 ........................................................................................11

45 Fed. Reg. 72,995-72,997 ............................................................................11

46 Fed. Reg. 40,686-40,688  (28 C.F.R. 41.51(d) ...........................................11

53 Fed. Reg. 2134 ...........................................................................................10

56 Fed. Reg. 35,719 ........................................................................................15

Exec. Order No. 13,217, 66 Fed. Reg. 33,155 (June 18, 2001).......................15

Fed. Reg. 2134 ................................................................................................10

**ARTICLES**

DOJ, Civil Rights Division, Statement of the Department of Justice on
Enforcement of the Integration Mandate of Title II of the Americans with
Disabilities Act and Olmstead v. L.C. (June 22, 2011), available at:
https://www.ada.gov/olmstead/q&a olmstead.htm (last visited 5/10/18)............14

National Council on Disability, *Deinstitutionalization: Unfinished Business-
Companion Paper to Unfinished Business Toolkit* (October 23, 2012),
https://ncd.gov/rawmedia_repository/NCD_UnfinishedBusiness_Paper_FINAL5
08.pdf (last visited 5/9/18).......................................................................................9

The Disability Rights and Independent Living Movement, the University of
Berkley, California.
http://bancroft.berkeley.edu/collections/drilm/resources/timeline. (last visited
5/10/18)......................................................................................................................6

*The Past and Future of Deinstitutionalization Litigation*, 34 Cardozo L. Rev. 1, 7–
8 (2012).....................................................................................................................8

## INTEREST OF *AMICI CURIAE*[1]

This case implicates the rights of individuals with intellectual and developmental disabilities ("I/DD") and those with psychiatric disabilities ("PD") (collectively, "mental disabilities") under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). The mission of *Amicus* Arizona Center for Disability Law ("ACDL") is to promote and protect the legal rights to independence, justice, and equality of individuals with disabilities. ACDL is the federally-mandated Protection and Advocacy ("P&A") agency for people with disabilities in Arizona. 42 U.S.C. § 10801 *et seq.*; 42 U.S.C. § 15041 *et seq.* The P&A mandate grants ACDL authority to "pursue administrative, legal, and other appropriate remedies" to ensure the protection of, and advocacy for, individuals with mental illness (42 U.S.C. § 10805(1)(B) (2016)), and individuals with developmental disabilities (42 U.S.C. § 15043(2)(A)(i) ) in the State. More specifically, ACDL can "monitor, evaluate and com12102ment on the development and implementation of Federal, State and local laws, regulations, plans, budgets, levies, projects, policies and hearings affecting individuals with mental illness as a part of federally funded advocacy activities." 42 C.F.R. § 51.31(f) (2017). ACDL

---

[1] No counsel for a party has authored this brief in whole or in part, and no party or counsel for a party has made a monetary contribution intended to fund the preparation or submission of the brief. No person other than *amici* or their counsel has made a monetary contribution to the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

is obligated to "carry out systemic advocacy—those efforts to implement changes in policies and practices of systems that impact persons with mental illness." *Id*.

Mandatory detention of individuals with mental disabilities in a locked inpatient medical facility or prison outside of their communities when they are qualified to receive services in the community is not "the most integrated setting appropriate to the needs" of those individuals. *See* 28 C.F.R. § 35.130 (d). The Supreme Court in *Olmstead v. L.C. ex.rel. Zimring*, 527 U.S. 581 (1999), interpreted the Americans with Disabilities Act, which was modeled on Section 504, to mean that "[u]njustified isolation "is properly regarded as discrimination based on disability." *Id*. at 597.

*Amicus* ACDL submits this brief in support of Defendant-Appellant in this matter to vindicate the rights of Arizonans with mental disabilities determined incompetent to stand trial to access federal competency restoration in the most integrated setting possible appropriate for the individual's needs.[2]

*Amicus* William E. Morris Institute for Justice ("Morris Institute") is a non-profit public interest law firm providing legal representation and advocacy on behalf of low-income Arizonans. The Morris Institute represents the interests of low-income Arizonans, people of color, and people with disabilities, by: major impact

---

[2] At the request of Defendant-Appellant's counsel, Defendant-Appellant's name has been redacted.

and class action litigation; advocacy with federal and state administrative agencies; advocacy at the Arizona Legislature; and technical assistance, training and support for Arizona's three legal services programs. *Amicus* Morris Institute has an interest the criminal justice system and how it impacts people with disabilities.

Pursuant to Federal Rule of Appellate Procedure 29(a), *amici curiae* submit this brief without an accompanying motion for leave to file or leave of court because all parties have consented to its filing.

## STATEMENT OF THE ISSUES

*Amici* will address:

1.    Whether the mandatory pre-trial detention of all individuals who have been found mentally incompetent to stand trial in a locked inpatient medical facility without an individualized determination of the most integrated setting appropriate for the individual's needs violates Section 504.

2.    Whether 18 U.S.C. § 4241(d)—stating that a court must commit a defendant found mentally incompetent to stand trial to the custody of the Attorney General for "hospitalization" in a "suitable facility"—can be harmonized with Section 504's mandate to administer the Department of Justice's programs and activities in the most integrated setting appropriate for the needs of individuals with disabilities.

## INTRODUCTION

Under 18 U.S.C. § 4241(d), when a hearing on the matter demonstrates by a preponderance of the evidence that a defendant is not presently mentally competent to stand trial, the court "shall commit the defendant to the custody of the Attorney General." Then:

> The Attorney General shall *hospitalize* the defendant for treatment in a *suitable facility* – (1) for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward; and (2) for an additional reasonable period of time until—his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or the pending charges against him are disposed of according to law; whichever is earlier.

18 U.S.C. § 4541(d) (emphasis added).

Following the competency examination, pursuant to 18 U.S.C. § 4241(d), courts commit defendants for a period up to four (4) months to a designated facility operated by the Bureau of Prisons, a subdivision of the Department of Justice, for competency restoration. The Bureau of Prisons operates five Federal Medical Centers (FMCs) in Butner, North Carolina; Carswell at Fort Worth, Texas; Devens at Ayer, Massachusetts; Lexington,

Kentucky; and Rochester, New York.[3] These FMC's are locked inpatient medical institutions in prison complexes. Individuals found incompetent to stand trial ("IST") are transported to one of these facilities for competency restoration. This process does not include an individualized determination of the most integrated setting appropriate for the individual to receive competency restoration. Even if there were individualized determinations, the only placement option is the federal medical centers.

Individuals with mental disabilities who are able to participate in outpatient competency restoration services in their communities and are not opposed to participating in community-based competency restoration services are denied a community-based option, as 42 U.S.C. § 4241(d) has been interpreted.

## ARGUMENT

**I. MANDATORY DETENTION OF INDIVIDUALS FOUND INCOMPETENT TO STAND TRIAL IN A LOCKED INPATIENT FACILITY—WITHOUT AN INDIVIDUALIZED DETERMINATION OF THE MOST INTEGRATED SETTING APPROPRIATE FOR THEIR NEEDS—VIOLATES SECTION 504 OF THE REHABILITATION ACT.**

### A. The History of Discrimination by Institutionalization of Individuals with Mental Disabilities Provides Context for Understanding the Integration Mandate.

---

[3] Federal Bureau of Prisons, List of Federal Medical Centers, available at https://www.bop.gov/locations/list.jsp (last visited May 10, 2018).

There has been a sea change in the laws, policies, and views in the United States that has led society away from mass institutionalization to community-based services for people living with mental disabilities. In the past, government wielded the law as a sword against people with mental disabilities[4] to justify isolation and segregation. Today, the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") provide a shield from unjustified isolation and segregation. To understand the critical importance of this integration mandate, as well as modern efforts to effectuate its requirements, we must revisit the history of purposeful discrimination against individuals with mental disabilities, and their segregation from society through confinement in institutions.

As Justice Thurgood Marshall eloquently stated, people with I/DD have been "subject to a lengthy and tragic history of segregation and discrimination that can only be called grotesque." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 461 (1985) (concurring in part, dissenting in part). Justice Marshall recounted the discriminatory animus leading to massive institutionalization of people with I/DD:

> During much of the 19th century, mental retardation was viewed as neither curable nor dangerous and the retarded were largely left to their own devices. By the latter part of the century and

---

[4] The Disability Rights and Independent Living Movement, the University of Berkley, California. http://bancroft.berkeley.edu/collections/drilm/resources/timeline. (last visited May 10, 2018).

during the first decades of the new one, however, social views of the retarded underwent a radical transformation. Fueled by the rising tide of Social Darwinism, the 'science' of eugenics, and the extreme xenophobia of those years, leading medical authorities and others began to portray the 'feeble-minded' as a 'menace to society and civilization... responsible in a large degree for many, if not all, of our social problems.' A regime of state-mandated segregation and degradation soon emerged that in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow. Massive custodial institutions were built to warehouse the retarded for life; the aim was to halt reproduction of the retarded and 'nearly extinguish their race.'

*Id*. at 461–63 (affirming invalidation of zoning ordinance requiring group homes for people with ID to obtain special use permits). "Prejudice, once let loose, is not easily cabined" and, as Justice Marshall explained, "lengthy and continuing isolation of the retarded perpetuate[s] the ignorance, irrational fears, and stereotyping that long ha[s] plagued them." *Id*. at 464; *see also* 42 U.S.C. § 12101(2) ("historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination . . . continue to be a serious and pervasive social problem"). People living with PD faced similar forced institutionalization, segregation, and sterilization. *See infra*.

The numbers of institutionalized people with mental disabilities continued to grow in the United States until deinstitutionalization efforts culminated in a shift in federal and state policy from mass institutionalization to community-based treatment. In 1967, the number of people with I/DD in state-operated institutions

peaked at nearly 200,000.[5]  Since 1967, states have closed hundreds of their institutions and downsized many others.[6]  Between 1980 and 2009, 24 states and the District of Columbia reduced the population of people with I/DD in their large institutions by more than 80%.[7]

The population of individuals with PD subjected to institutionalization in psychiatric hospitals rivaled the number of individuals with I/DD forced into institutions. In 1955, the end-of-year inpatient census in public U.S. psychiatric hospitals in the United States was at its height at nearly 560,000 individuals.[8] By 2003, the end-of-year inpatient census was just under 50,000, a drop of about 90%.[9] The total number of public psychiatric hospitals in the United States decreased from 310 in 1970 to 220 in 2000, and the average length of the hospital stay has dramatically declined for the majority of patients admitted.[10]

These drastic reductions were due to the positive effect of deinstitutionalization of The National Council on Disability ("NCD")—an agency

---

[5] *See* Samuel R. Bagenstos, *The Past and Future of Deinstitutionalization Litigation*, 34 Cardozo L. Rev. 1, 7–8 (2012).

[6] *See* Bagenstos, *supra* note 5, at 8.

[7] *Id.*

[8] *See* Bagenstos, *supra* note 5, at 9.

[9] *Id.*

[10] In 2007, state psychiatric hospitals discharged patients within an average of 30 days, which is dramatic decrease since the 1950s. *See* Bagenstos, *supra* note 5, at 9.

that advises the President and Congress about disability issues—reports that "[a] substantial body of research has evaluated the impact of deinstitutionalization on quality of life, behavioral outcomes, life satisfaction, competence in activities of daily living, challenging behaviors, and health [and . . .] regardless of analytical technique find that living in the community yields positive results in a number of quality of life domains."[11]

## B. Section 504 of the Rehabilitation Act Prefers Community-Based Rather than Institutional Treatment of Individuals Living with Mental Disabilities.

The Section 504 statute and integration regulation prohibit undue institutionalization of individuals with disabilities and require the Department of Justice ("DOJ") to ensure that the agency conducts its programs and activities, including competency restoration, in the most integrated setting appropriate for the individual defendant with a disability. Section 504 requires that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely, by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination." 29 U.S.C. § 794(a). Section 504's nondiscrimination mandate applies to "*any* program or activity receiving Federal

---

[11] *See* National Council on Disability, *Deinstitutionalization: Unfinished Business-Companion Paper to Unfinished Business Toolkit* (October 23, 2012), https://ncd.gov/rawmedia_repository/NCD_UnfinishedBusiness_Paper_FINAL508 .pdf (last visited May 9, 2018).

financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." *Id*. (emphasis added).

In 1976, after Section 504 was enacted, President Gerald Ford issued an executive order instructing the (then) Department of Health, Education, and Welfare ("HEW") to issue regulations implementing Section 504 to include "establish[ing] standards for determining who are handicapped individuals and guidelines for determining what are discriminatory practices, within the meaning of section 504." Exec. Order No. 11914, 41 Fed. Reg. 17,871 (Apr. 28, 1976). The President also instructed every federal agency that distributes federal funds to "issue rules, regulations, and directives, consistent with the standards and procedures established by" HEW. *Id.*

In 1978, HEW issued the first set of coordination regulations. Those regulations required recipients of federal funds to "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 53 Fed. Reg. 2138 (Jan. 13, 1978). The original coordination regulations' preamble clarified that "separate" treatment of individuals with disabilities "can be permitted *only where necessary* to ensure equal opportunity and truly effective benefits and services." 53 Fed. Reg. 2134 (emphasis added). In 1980, other agencies, including DOJ, promulgated Section 504 regulations governing recipients of their agency's federal funds. Those agencies included the same

integration requirement. *See, e.g.*, 45 Fed. Reg. 37,622 (June 3, 1980) (DOJ regulations) ("Recipients shall administer programs in the most integrated setting appropriate to the needs of qualified handicapped persons."). In 1981, Executive Order 12250 transferred the coordination responsibility for Section 504's implementation and enforcement among federal agencies from HEW to DOJ. 45 Fed. Reg. 72,995-72,997 (Nov. 2, 1980). The integration mandate regulation remained unmodified. *See* 46 Fed. Reg. 40,686-40,688 (Aug. 11, 1981) (28 C.F.R. 41.51(d)).

Currently, DOJ's implementing regulations for Section 28 C.F.R. § 39.130(a)—mirrors the statute's general proscription against discrimination (*see supra*) and requires that DOJ "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 39.130(d).

To comply with the Section 504's integration mandate, federal agencies are required to make reasonable modification of their policies, procedures or practices when necessary to avoid discrimination. *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (recognizing that "to assure meaningful access [under Section 504], reasonable accommodations in the grantee's program or benefit may have to be made"). In *Franco-Gonzales v. Holder*, plaintiffs requesting a Temporary Restraining Order were aliens with serious mental illnesses that faced going through

immigration proceedings (including detention and removal) without appointed counsel. 767 F.Supp.2d 1034, 1058 (C.D. Cal. 2010). The court applied the DOJ's 504 regulations and found that the plaintiffs had qualifying disabilities and were entitled to a Qualified Representative (counsel) in their immigration proceedings as a reasonable accommodation under Section 504. *Id*.

As in *Franco-Gonzales*, the Attorney General and the Bureau of Prisons are required to make reasonable accommodations with regard to how they deliver competency restoration services to comply with Section 504's integration mandate and DOJ's own regulations regarding the same.

## C. The Supreme Court's Interpretation of the ADA's Integration Mandate in *Olmstead v. L.C. ex rel. Zimring* Applies Equally to Section 504.

In 1995, two residents of Georgia institutions sued the state, claiming they had the right to receive care in the most integrated setting appropriate and that their unnecessary institutionalization was discriminatory, in violation of Title II of the "ADA." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). The Supreme Court ruled that "[u]njustified isolation [] is properly regarded as discrimination based on disability." *Id*. at 597. In so finding, the Supreme Court considered whether Title II's "proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions" and concluded that it

does in some circumstances.[12] *Id*. at 587. The Court found this, in part, because "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601. The Court went on to note that an individual assessment is generally required to determine "whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program." *Id.* at 602.

The *Olmstead* Court held that States must "provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id*. at 607.

DOJ clarified in subsequent technical guidance to the States that integrated settings "are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing;

---

[12] The Court declined to reach the validity of integration regulation promulgated by DOJ because the parties did not challenge the legitimacy of Title II's regulations. *Id*. at 592. The Court did find that DOJ, in amicus briefs, had consistently taken the position that Title II proscribes undue institutionalization by reason of disability as discrimination. *Id*. at 597-98, n. 9. The Court concluded that those views warranted respect.

afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible." DOJ, Civil Rights Division, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C. (June 22, 2011), available at: https://www.ada.gov/olmstead/q&a olmstead.htm (last visited May 10, 2018) .[13]

The Supreme Court's reasoning in *Olmstead* applies equally to executive agencies as to programs and activities conducted with federal financial assistance under Section 504. *See Sanchez v. Johnson*, 416 F.3d 1051, 1063 (9th Cir. 2005) (concluding that for purposes of that appeal the integration regulations enacted pursuant to the ADA and Section 504 both express a clear policy preference in favor of integrating developmentally disabled persons into the community over institutional care and would be interpreted as "co-extensive").

Congress explicitly modeled the ADA's Title II on Section 504 in their basic prohibitions on discrimination and in the available remedies, procedures, and rights. *Compare* 29 U.S.C. § 794(a) *to* 42 U.S.C. § 12132; 42 U.S.C. § 12133. Congress directed the Attorney General to promulgate Title II implementing regulations that

---

[13] In their discussion, DOJ notes; "[c]laims under the ADA and the Rehabilitation Act are generally treated identically." *Id.* at n.4.

are "consistent" with DOJ's coordination regulations governing the implementation and enforcement of Section 504. 42 U.S.C. § 12134.

In fact following *Olmstead*, President George W. Bush issued an Executive Order titled "Community Based Alternatives for Individuals with Disabilities," which directed six federal agencies, including the Department of Justice, to "evaluate the policies, programs, statutes, and regulations . . . to determine whether any should be revised . . . to improve the availability of community-based services for qualified individuals with disabilities." Exec. Order No. 13,217, 66 Fed. Reg. 33,155 (June 18, 2001).

### D. The Legally Correct Default for Individuals Determined Incompetent to Stand Trial Who Can Be Served in Community-Based Services Is A Placement in the Community.

Competency restoration services fall within DOJ's programs and activities, all of which are subject to DOJ's Section 504 implementing regulations. *See* 28 C.F.R. § 39.102 ("applies to *all* programs or activities conducted by the agency") (emphasis added); *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998) (concluding broad definition of "state" under the ADA did not have any exception that could cast the coverage of prisons into doubt). Most, if not all, individuals found incompetent to stand trial ("IST") under the procedures of 18 U.S.C. § 4241 will satisfy Section 504's legal definition of an individual with a disability because they have a mental impairment that substantially limits at least one major life activity.

15

*See* 28 C.F.R. § 39.103 (Section 504 definition of "handicapped"). For an individual to be found IST they must be "presently suffering from mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). This implicates, at a minimum, the major life activities of thinking, concentrating, and communicating. *See* 42 U.S.C. § 12102(2)(A) (ADA definition of "major life activity").

Mandatory detention to an inpatient institution for every individual found IST precludes an individualized assessment of their needs and placement in the most integrated setting in which their needs can be met, and therefore violates Section 504's integration mandate. The absence of a continuum of competency restoration services in less restrictive settings and the allocation of all resources to institutional placements results in unjustified segregation of people with mental disabilities. Detention at a medical institution of a prison complex is not in mainstream society; does not offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; does not afford individuals choice in their daily life activities; and, does not provide individuals with disabilities the opportunity to interact with non-disabled persons, except for prison staff/medical providers. Finally, confinement in a Bureau of Prison institution severely diminishes

the everyday life activities of individuals found IST, including family relations, social contacts, work options, economic independence, and continuation of services.

### E. Like Other Programs and Services, Competency Restoration Services Must Be Provided in an Integrated Setting.

Courts have extended the integration mandate's reach beyond the programs and services at issue in *Olmstead*. The integration mandate has been applied across numerous different types of programs and services to enforce the rights of individuals with disabilities to be free from undue segregation and institutionalization, including in: education (*U.S. v. Georgia*, 1:17-cv-03999 (N.D. Ga. 2017) (ongoing)); Medicaid services,[14] consolidated with *A.R. v. Dudek*, 12-cv-60460 (S.D. Fla. 2012) (ongoing)); children's services (*Katie A., et. al. v. Douglas, et. al.*, CV-02-05662 (C.D. Cal. 2011); nursing facilities (*U.S. v. Marion County Nursing Home District*, 2:13-cv-00026 (E.D. Mo. 2013)); board and care/adult care facilities (*U.S. v. New York,* 13-cv-4165 (E.D.N.Y. 2013)); and sheltered workshops/segregated day services (*U.S. v. Rhode Island,* 1:14-cv-00175 (D.R.I. 2014)).

Like other programs and services, community-based restoration to competency program options must be made available to individuals as appropriate

---

[14] *See Townsend v.* Quasim, 328 F.3d 511, 520 (9th Cir. 2003) (remanding to district court holding "the denial of community-based long term care for 'medically needy' disabled persons violates the ADA unless the [Washington Department of Social and Health Services] can demonstrate that extending eligibility to these persons would fundamentally alter its Medicaid programs")

based on their needs. At least twenty-nine states—Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Louisiana, Maine, Maryland, Minnesota, Mississippi, Nevada, New Hampshire, New Jersey, New York, North Dakota, Ohio, Oregon, Texas, Virginia, Washington, West Virginia and Wisconsin—and the District of Columbia allow for community-based and outpatient competency restoration as a treatment option.[15]  The statutes or

---

[15] **Arizona:** Ariz. Rev. Stat. Ann. § 13-4512 (2005) ("court shall select the *least restrictive treatment alternative* after considering . . . the defendant's willingness to submit to *outpatient competent restoration treatment* as a condition of pretrial release") (emphasis added); **Arkansas:** Ark. Code Ann. § 5-2-310 (2017) (court may commit the defendant to the custody of the Department of Human Services for "detention, care, and treatment until restoration of fitness to proceed [and] *may release with conditions* while receiving restoration treatment if defendant does not pose a danger") (emphasis added); **California:** Cal. Penal Code § 1370 (2018) (court has the discretion to order a defendant requiring competency restoration services to be placed at the state hospital, other secured public or private treatment facility, including community-based residential treatment, "on *outpatient status*") (emphasis added); **Colorado:** Colo. Rev. Stat. Ann. § 16-8.5-111 (2017) ("the court shall consider whether restoration to competency should occur *on an outpatient and out-of-custody basis*" for defendants on bond) (emphasis added); **Connecticut:** Conn. Gen. Stat. Ann. § 54-56d (i)(3) (2016) ("the court shall order the placement, on either an inpatient or an *outpatient basis*, which the court finds is the *least restrictive placement appropriate and available* to restore competency") (emphasis added); **Florida:** Fla. R. Crim. P. 3.212 (2018) ("If the court finds that the defendant may be *treated* [for competency restoration] *in the community* on bail or other release conditions, the court may make acceptance of reasonable medical treatment a condition of continuing bail or other release conditions") (emphasis added); **Georgia:** Ga. Code Ann. § 17-7-130 (2017) (permitting courts in misdemeanor and nonviolent offenses to "allow continued treatment [for competency restoration] to be done on an *outpatient basis* by the department") (emphasis added); **Hawaii:** Haw. Rev. Stat. § 704-406 (1) (2016) (authorizing courts to place defendants in an "appropriate institution for detention, care, and treatment" for competency restoration); *see also* Available Adult Mental

Health Services, *available at* https://health.hawaii.gov/amhd/files/2013/06/AMHD-Array-of-Services.pdf (last visited May 10, 2018) (describing Forensic Community-Based Fitness Restoration for persons released on conditions of release under 704-406(1) status); **Idaho:** Idaho Code Ann. § 18-212 (2000) (requiring court to commit defendant in need of competency restoration to "the custody of the director of the department of health and welfare for care and treatment at an appropriate facility" and defining facility to include a mix of institutional and community-based settings); **Illinois:** 725 Ill. Comp. Stat. Ann. 5/104-17 (2018) (requiring the court to "select the *least physically restrictive form of treatment therapeutically appropriate and consistent with the treatment plan*" for defendants requiring competency restoration who are on conditions of release or their own recognizance [and] order placement on either on an inpatient or an *outpatient* basis) (emphasis added); **Indiana:** Ind. Code Ann. § 35-36-3-1 (2018) (requiring court to commit defendant to the division of mental health and addiction that "shall provide competency restoration services or enter into a contract for the provision of competency restoration services in the . . . *least restrictive setting appropriate to the needs of the defendant* and the safety of the defendant and others) (emphasis added); **Iowa:** Iowa Code Ann. § 812.6 (2014) (authorizing court to order community-based mental health treatment for competency restoration as a condition of release upon a finding that the defendant does not pose a danger to the public peace and safety, is otherwise qualified for pretrial release, and is willing to cooperate with treatment); **Louisiana:** La. Code Crim. P. Ann. Art 648 (2014) (permitting court to "order *outpatient care and treatment*" for competency restoration when the defendant is not charged with a felony or misdemeanor offenses against the person and is unlikely to commit violent crimes) (emphasis added); **Maine:** Me. Rev. Stat. tit. 15, § 101-D (2016) (authorizing court to commit the individual in need of competency restoration to the custody of the Commissioner of Health and Human Services or release on bond for placement in an appropriate program for observation, care and treatment, listing inpatient and outpatient treatment options); **Maryland:** Md. Code Ann. Crim. Proc. 3-106 (2013) (giving courts discretion to set bail or release on recognizance for non-dangerous defendant following determination that they are incompetent to stand trial); **Minnesota:** Minn. R. Crim. P. 20-01 (2015) (requiring the defendant's mental examination to include "any treatment required for the defendant to attain or maintain competence and an explanation of appropriate treatment alternatives . . . including the extent to which the defendant can be treated without commitment to an institution); **Mississippi:** Miss. R. Crim. P. 12.5 (2017) ("If the court finds that the defendant is incompetent to stand trial, then the court may commit the defendant to the Mississippi State Hospital, other appropriate mental

19

---

health facility, or other place of treatment, either *inpatient or outpatient*," based on the psychological or psychiatric report) (emphasis added); **Nevada:** Nev. Rev. Stat. Ann. § 178.425 (2017) ("If the court finds the defendant incompetent but not dangerous . . . and [] that commitment is not required for a determination of the defendant's ability to receive treatment to competency and to attain competence, the judge shall order the defendant to report to the Administrator or [] designee as an *outpatient for treatment*. . .") (emphasis added); **New Hampshire:** New. Hamp. Rev. Ann. 135-17-a (2017) (authorizing court to release to the supervision of the division of field services and impose conditions, including participating in a competency restoration program, where individual does not pose a danger to the community and is eligible for bail); **New Jersey:** N.J. Stat. Ann. § 2C:4-6 (2018) (in cases where the defendant is not a danger to himself or others, the court "shall proceed to determine whether placement in an *out-patient setting or release* is appropriate") (emphasis added); **New York:** N.Y. Crim. Proc. Law § 730.40 (2013) (permitting the court to commit a defendant who is found incompetent to stand trial to the custody of the commissioner for care and treatment on an outpatient basis upon the consent of the prosecutor); **North Dakota:** N.D. Cent. Code Ann. § 12.1-04-08 (2013) (permitting the court to make a referral for "appropriate services, treatment, or civil commitment" and defining treatment to include "treatment of the person by a human service center or other appropriate public or private provider"); **Ohio:** Ohio Rev. Code Ann. § 2945.38 (2016) ("In determining the place of commitment, the court shall consider the extent to which the person is a danger to the person and to others, the need for security, and the type of crime involved and shall order the least restrictive alternative available that is consistent with public safety and treatment goals"); **Oregon:** Or. Rev. Stat. Ann. § 161.370 (2)(a) ("If the court finds that the defendant is dangerous to self or others... [or that] the services and supervision necessary to restore the defendant's fitness to proceed are not available in the community, the court shall commit the defendant to the custody of the superintendent of a state mental hospital or director of a facility"); **Texas:** Tex. Crim. Proc. Code Ann. § 46B.072 (2017) (if misdemeanor and not a danger: defendant may be "treated on an outpatient basis with the specific objective of attaining competency to stand trial" with various qualifications). If felony (46B.073) (2017), "shall commit a defendant described by Subsection (a) to a mental health facility, residential care facility, or jail-based competency restoration program" for not more than 120 days); **Virginia:** Va. Code Ann. § 19.2-169.2 (2017) ("the court shall order that the defendant receive treatment to restore his competency on an outpatient basis or, if the court specifically finds that the defendant requires inpatient hospital treatment, at a hospital designated by the Commissioner of Behavioral Health and Developmental

rules in Arizona, Idaho, Illinois, Indiana, and Oregon explicitly incorporate anti-discrimination principles, such as individualized and appropriate services available in a continuum of placement options that include outpatient treatment and community-based services.

Qualifying participants in these community-based outpatient restoration to competency programs experience the benefits of integration recognized in the research by the National Council on Disability. *See supra*. The Wisconsin Outpatient Competency Restoration Program, for example, uses an individualized, multi-modal approach for outpatient competency remediation for those defendants deemed to be suitable. *See* Wisconsin's Provider Program Description, *available at*

---

Services as appropriate for treatment"); **Washington:** Wash. Rev. Code Ann. § 10.77.086 (2015) (for felonies, the court "[s]hall commit the defendant to the custody of the secretary who shall place such defendant in an appropriate facility of the department for evaluation and treatment… or [m]ay alternatively order the defendant to undergo evaluation and treatment at some other facility [which can include city or county jails] or provider as determined by the department, or under the guidance and control of a professional person"); **West Virginia:** W. Va. Code Ann. § 27-6A-2-7 (2007) ("If it is the qualified forensic evaluator's opinion that the defendant is not competent to stand trial, the report shall state whether the defendant is substantially likely to attain competency within the next three months and, in order to attain competency to stand trial, whether the defendant requires inpatient management in a mental health facility"); **Wisconsin:** Wis. Stat. Ann. § 971.14 (2018) (locations for defendants to receive competency restoration services include an appropriate institution, a *community-based treatment program* under contract with the department, or in a jail or a locked unit of a facility); **District of Columbia:** D.C. Code Ann. § 24-531.05(a)(1) (2012) ("the court may order the defendant to participate in treatment for restoration of competence on an inpatient or *outpatient* basis") (emphasis added).

http://www.bciwi.com/wordpressbciwi/ocrp/ (last visited May 10, 2018). There, the program assigns a Behavioral Specialist and a Case Manager to each participant. *Id*. Wisconsin, through a contract provider, offers services in integrated settings as sessions with the Behavioral Specialist occur in public locations and case management sessions generally occur in the home. *Id*. Through this program, participants may attempt competency remediation without losing liberty, employment, income from employment or Social Security benefits, and housing. *Id*. Participants avoid disruption in continuity of services, treatment, or care from community service providers and access to their support system. *Id*. Finally, participants receive services in a familiar environment. *Id*.

Providing competency restoration in the community does not alter the nature of competency restoration. In fact, the government benefits from having a continuum of competency restoration treatment and services that includes outpatient and community-based options. In a 2016 study of about 13 outpatient competency restoration programs, rates of competency restoration averaged 70% and rates of unrestorability averaged 20.3%.[16] The outpatient programs did not report any incidences or arrests for serious violence.[17] The average rate of negative

---

[16] W. Neil Gowenstein, Lynda E. Frost, Danielle W. Speelman & Danielle E. Therson, *Lookin' for Beds in All the Wrong Places: Outpatient Competency Restoration as a Promising Approach to Modern Challenges*, 22 Psychol. Pub. Pol'y Journal 293, 299 (2016).

[17] *See* Gowenstein et al., *supra* note 16, at 299.

incidences—arrests, elopements, acute decompensations, and serious rule violations—was 16.7% across the states.[18]

Moreover, outpatient compensatory restoration services are also less expensive than inpatient services.[19] Community-based restoration services further aid government in complying with due process requirements to conduct competency evaluations within a reasonable time following a court's order given limited forensic resources. *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 822 F.3d 1037, 1040 (9th Cir. 2016) (applying the due process clause of the Fourteenth Amendment to pretrial detainees waiting declaration of fitness to stand trial); *see also Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, C14-1178-MJP, 2016 WL 4268933, at *1 (W.D. Wash. Aug. 15, 2016), *reconsideration denied,* C14-1178-MJP, 2016 WL 4418180 (W.D. Wash. Aug. 19, 2016) (modifying injunction to require in-jail competency evaluations within fourteen days of the signing of a court order).[20]

And significantly, outpatient and community-based restoration programs and services can provide an array of treatment setting options, which allows the

---

[18] *See* Gowenstein et al., *supra* note 16, at 299.

[19] Based on administrators' reported costs for inpatient versus outpatient restoration services, using outpatient restoration services realizes an estimated daily net savings of $388/day or approximately $57,800 for the overall estimated length of stays. *See* Gowenstein et al., *supra* note 16, at 299.

[20] *See also* Gowenstein et al., *supra* note 16, at 293.

government to provide such programs and services in the most integrated setting appropriate to the needs of the individual to comply with its Section 504 obligations.

## II. THE ATTORNEY GENERAL'S STATUTORY OBLIGATION TO HOSPITALIZE IN A SUITABLE FACILITY CAN BE HARMONIZED WITH ITS SECTION 504 OBLIGATION TO ADMINISTER ITS RESTORATION TO COMPETENCY PROGRAM IN THE MOST INTEGRATED SETTING APPROPRIATE.

"Where an appellate court can construe two statutes so that they conflict, or so that they can be reconciled and both can be applied, it is obliged to reconcile them." *United States v. Gallenardo*, 579 F.3d 1076, 1083 (9th Cir. 2009); *citing Momeni v. Chertoff*, 521 F.3d 1094, 1097 (9th Cir. 2008). Section 504 can only be reconciled with 18 U.S.C. § 4241(d) if § 4241(d) is not interpreted to require mandatory inpatient commitment to an institution for competency restoration.

As discussed fully, *supra*, Section 504 and its implementing regulations require DOJ to administer its programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. Interpreting 18 U.S.C. § 4241(d) to require mandatory commitment of defendants found IST to an inpatient facility clearly violates the integration mandate in *Olmstead* and Section 504, as it does not provide for an individualized assessment of a person's needs or allow any discretion on how to best treat those needs in the most integrated setting possible.

Considering 18 U.S.C. § 4241(d) in light of Section 504's integration mandate, the statutes can be harmonized. There is nothing in the plain language of 4241(d) or Section 504 and its implementing regulations that creates an irreconcilable conflict. The statutes only become irreconcilable through an interpretation of "hospitalization in a suitable facility" that mandates confinement in an *inpatient* facility without an individualized determination of whether such confinement will provide the sort of care and treatment that might return an individual to competency, or whether such unjustified isolation can be avoided by placement is an outpatient program (i.e. a more integrated setting) that is appropriate for a defendant's needs.

At least one Court has harmonized 18 U.S.C. § 4241(d)'s language of "hospitalization in a suitable facility" to not require mandatory placement in a hospital to avoid constitutional concerns. The Court interpreted the provision as follows:

> Webster's Third New International Dictionary (1967) defines "hospitalize" as "to place in a hospital as a patient." Congress's use of this verb suggests that it wanted the Attorney General to place mentally incompetent defendants in institutions, something which according to the testimony presented to this court could lead to permanent harm for certain defendants…
>
> Fortunately, there is another meaning that one could put on the word "hospitalize" as it appears in § 4241(d): to place. The statute requires "treatment in a suitable facility." Section 4247(a)(2) defines "suitable facility" as "a facility that is suitable to provide care or treatment given the nature of the offense and the characteristics of the defendant."

> Section 4247(i)(C) requires the Attorney General "before placing a person in a facility pursuant to ... section 4241 [to] consider the suitability of the facility's rehabilitation programs in meeting the needs of the person." Congress's repeated emphasis on suitable facilities in these provisions indicates that it did not intend for the Attorney General to put mentally incompetent defendants into a hospital automatically upon a judicial finding of incompetency. Instead, Congress wanted the Attorney General to give the accused the treatment which the accused needs to become competent to stand trial. Such an interpretation avoids the constitutional problems that could arise when institutionalization would harm the accused, rather than help.

*United States v. Sherman*, 722 F. Supp. 504, 505–06 (N.D. Ill. 1989), *aff'd,* 912 F.2d 907 (7th Cir. 1990).

Despite the conflict between Section 504 and the courts' interpretation of § 4241(d), courts have not examined whether the statutes can be reconciled on previous due process challenges to § 4241(d). *See, e.g., United States v. Shawar*, 865 F.2d 856, 864 (7th Cir. 1989); *United States v. Donofrio*, 896 F.2d 1301, 1303 (11th Cir. 1990); *United States v. Filippi*, 211 F.3d 649, 652 (1st Cir. 2000); *United States v. Stanford*, 769 F.Supp.2d 1083, 1089 (S.D. Tex. 2011).

Similarly, in *United States v. Strong*, this Court found that a defendant's right to due process was not violated by interpreting 18 U.S.C. § 4241(d) to require mandatory commitment, because the statute "is both limited in duration and reasonably related to the purpose for which the defendant is confined." 489 F.3d 1055, 1060-63 (9th Cir. 2007). Critically, however, the Court in *Strong* did not address whether the district court was correct in interpreting § 4241(d) to mandate

*inpatient* commitment. In fact, the Court specifically did not address the defendant's argument regarding whether the proposed in-patient commitment violated Section 504 of the Rehabilitation Act, because the Court held that the defendant had waived that argument. *See* 489 F.35 at 1060 n. 4.

## CONCLUSION

For the foregoing reasons, mandatory pre-trial detention of all individuals who have been found mentally incompetent to stand trial in a locked inpatient medical facility without an individualized determination of the most integrated setting appropriate to the individual's needs violates Section 504. The statute—18 U.S.C. § 4241(d)—can be harmonized with Section 504's mandate to administer the Department of Justice's programs and activities in the most integrated setting appropriate for the needs of individuals with disabilities. The determination of an appropriate facility for an individual's restoration to competency services must be determined in light of the D's obligation to administer its programs in the most integrated setting appropriate to the needs of individuals with disabilities.

Dated: May 14, 2018          Respectfully submitted,

s/Rose Daly-Rooney
ARIZONA CENTER FOR
DISABILITY LAW
Rose Daly-Rooney
Christian Carlsen
Maya S. Abela
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Email:
rdalyrooney@azdisabilitylaw.org
ccarlsen@azdisabilitylaw.org
mabela@azdisabilitylaw.org
Tel:  (520) 327-9547
Fax:  (520) 884-0992

*Attorneys for Amicus Arizona Center
for Disability Law*

s/Ellen Sue Katz
WILLIAM E. MORRIS INSTITUTE
FOR JUSTICE
Ellen Sue Katz
3707 North Seventh Street, Suite 300
Phoenix, AZ 85014
Email: eskatz@qwestoffice.net
Tel: (602) 252-3432
Fax: (602) 252-8138

*Attorney for Amicus William E. Morris
Institute for Justice*

**CERTIFICATE OF COMPLIANCE PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 32(A)(7)(B) AND CIRCUIT RULE 32-1**

I certify that the forgoing brief of Arizona Center for Disability Law and William E. Morris Institute for Justice complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief contains 6716 words as determined by the word count function in Microsoft Office Word 2016, is proportionately spaced, and has a typeface of 14 points.

Signed:    s/Rose Daly-Rooney
Rose Daly-Rooney
ARIZONA CENTER FOR
DISABILITY LAW
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Email: rdalyrooney@azdisabilitylaw.org
Tel: (520) 327-9547
Fax: (520) 884-0992

*Attorney for Amicus Arizona Center for Disability Law*

Dated: May 14, 2018

# CERTIFICATE OF SERVICE

U.S. Court of Appeals Docket Number: 4:16-CR-01937-TUC-JAS

I hereby certify that on May 14, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signed:    s/Rose Daly-Rooney
Rose Daly-Rooney
ARIZONA CENTER FOR
DISABILITY LAW
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Email:
rdalyrooney@azdisabilitylaw.org
Tel: (520) 327-9547
Fax: (520) 884-0992

*Attorney for Amicus Arizona Center*
*for Disability Law*

Dated: May 14, 2018